UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SETH HETTENA,<br><br>Plaintiff,<br><br>v.<br><br>CENTRAL INTELLIGENCE AGENCY,<br><br>Defendant. | Civil Action No. 22-877 (JEB) |

**MEMORANDUM OPINION**

In November 2003, Manadel al-Jamadi — an Iraqi national suspected of carrying out an October 27, 2003, terrorist attack on Red Cross offices in Baghdad — was detained and brought to Abu Ghraib prison for questioning. Interrogation by Central Intelligence Agency personnel led to his death, which would ultimately be ruled a homicide by the medical examiner who conducted his autopsy. In response to this incident and to an alleged effort by CIA agents to cover up what happened, the Agency's Inspector General opened an investigation that culminated in a November 2005 report. That report is the subject of this Freedom of Information Act suit.

Nearly twenty years after al-Jamadi's death, Plaintiff Seth Hettena, an investigative journalist, submitted a FOIA request for the OIG report. After Hettena filed this action, Defendant responded by producing a heavily redacted copy and later releasing a slightly less redacted version. The CIA now moves for summary judgment, contending both that its redactions are supported by national-security and intelligence concerns and that it has never

1

publicly acknowledged the information withheld. Plaintiff disagrees on both fronts and cross-moves for summary judgment. Although the piecemeal release of portions of the report has not been ideal, the Court ultimately sides with the Government and will accordingly grant its Motion.

**I.  Background**

The circumstances of al-Jamadi's death are certainly distressing, but only the procedural background regarding Hettena's FOIA request bears on the Court's analysis here. Those background facts are undisputed. On December 18, 2021, Plaintiff submitted a FOIA request to the CIA asking its Office of the Inspector General to disclose "a copy of the concluding document . . . of an investigation into the death of Manadal al-Jamaidi (aka Mandel al-Jamadi), including but not limited to an IG report dated November 3, 2005." ECF No. 13-4 (FOIA Request) at 1. Roughly a month later, Defendant sent Hettena a letter acknowledging receipt of his request. See ECF Nos. 13-1 (Def. Stmt. of Undisputed Material Facts), ¶ 3; 13-5 (January 11, 2022, Letter Acknowledging Receipt).

After waiting "20 business days" and receiving no response from the CIA, Hettena filed this action at the end of March 2022. See ECF Nos. 17-3 (Pl. Stmt. of Material Facts), ¶ 3; 1 (Compl.); see also 5 U.S.C. § 552(a)(6)(A)(ii) (requiring agency response within 20 business days of FOIA request). Plaintiff's action seemingly had its intended effect, as the Government responded by producing a (very heavily) redacted version of the 2005 OIG report after "conduct[ing] a page-by-page and line-by-line review" to determine what was releasable. See ECF No. 13-3 (Decl. of Vanna Blaine), ¶ 16; Def. SUMF, ¶ 5. At this point, the CIA released nothing except the title page, a partially redacted table of contents, a page and a half listing the federal criminal laws "potentially relevant" to OIG's investigation, and a page describing an

Agency regulation titled "Standards for Employee Accountability." ECF No. 17-4 (First Released OIG Report) at 4, 6, 85–86, 91–92; Pl. SMF, ¶ 4. To justify these withholdings, the CIA invoked a litany of FOIA exemptions: 1, 3, 5, 6, 7(C), and 7(D). See Def. SUMF, ¶ 4; Blaine Decl., ¶¶ 17–46.

Believing that it had satisfied its obligations under FOIA, Defendant moved for summary judgment in March 2023. See ECF No. 13-2 (Def. MSJ). Contending the exact opposite, Hettena responded with a Motion for Summary Judgment of his own last May. See ECF No. 17-1 (Pl. MSJ). What followed was nearly a year's worth of extensions, during which the CIA produced another copy of the OIG report in question — one that revealed a bit more information but was still almost entirely redacted pursuant to the aforementioned exemptions. See ECF No. 32-1 (Second Released OIG Report). With the complete set of briefs in hand and having compared *in camera* the unredacted and redacted versions of the report, the Court is now ready to rule on the rival Motions.

## II.    Legal Standard

Summary judgment must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it can affect the substantive outcome of the litigation. See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Liberty Lobby, 477 U.S. at 248; see also Scott v. Harris, 550 U.S. 372, 380 (2007); Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the

3

record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

"FOIA cases typically and appropriately are decided on motions for summary judgment." Defenders of Wildlife v. U.S. Border Patrol, 623 F. Supp. 2d 83, 87 (D.D.C. 2009); Brayton v. Office of U.S. Trade Rep., 641 F.3d 521, 527 (D.C. Cir. 2011). In a FOIA case, a court may grant summary judgment based solely on information provided in an agency's affidavits or declarations when they "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." Larson v. U.S. Dep't of State, 565 F.3d 857, 862 (D.C. Cir. 2009) (citation omitted). Such affidavits or declarations "are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citation and internal quotation marks omitted). "Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'" Dep't of Just. v. Reps. Comm. for Freedom of the Press, 489 U.S. 749, 755 (1989) (quoting 5 U.S.C. § 552(a)(4)(B)). Summary judgment is only proper when the court is assured that the record justifies the result. See Ctr. For Investigative Reporting v. Customs & Border Prot., 436 F. Supp. 3d 90, 100 (D.D.C. 2019).

**III.     Analysis**

Under FOIA, "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules[,] . . . shall make the records promptly available to any person."  5 U.S.C. § 552(a)(3)(A).  If the records fall into one of nine statutorily created exemptions, however, the Government need not turn over the requested information.  Id. § 552(b)(1)–(9).  To show that an exemption applies and justifies the withholding of records, the Government "must provide a 'relatively detailed justification'" for its withholding, "specifically identifying the reasons why a particular exemption is relevant." Morley v. CIA, 508 F.3d 1108, 1122 (D.C. Cir. 2007) (quoting King v. Dep't of Just., 830 F.2d 210, 219 (D.C. Cir. 1987).  This Court can compel the release of any records that do not satisfy the requirements of at least one exemption.  See Reps. Comm. For Freedom of Press, 489 U.S. at 755.

The parties have narrowed their dispute to the applicability of Exemptions 1 and 3 — which they agree substantially overlap, see Def. MSJ at 14; Pl. MSJ at 11 — and whether the CIA has officially acknowledged the information in the 2005 report, such that it must now produce the report even if these exemptions apply.

Before turning to the analysis of those three questions, a brief word on what will not be part of the Court's explication.  As Plaintiff explains, he is not contesting Defendant's "redaction of identifying information under Exemptions 6, 7(C), and 7(D)."  Pl. MSJ at 6.  Nothing further thus need be said as to those.  In addition, as the Court ultimately agrees that the CIA appropriately redacted the report pursuant to Exemptions 1 and 3, it also need not examine Plaintiff's objections concerning the applicability of Exemption 5.  This is because the information withheld under that last exemption is identical to that withheld under Exemptions 1

and 3.  See ECF No. 31 (Def. Reply) at 8 (making this point).  And, for much the same reason, the Court will not consider Hettena's contention that the Government did not meet the requirement of foreseeable harm stemming from disclosure, since these arguments concerned only Exemption 5.  Finally, to be clear, all material redacted under Exemption 1 is also withheld under Exemption 3 and *vice versa*.  The CIA thus need only prevail on either to obtain summary judgment.

With these caveats out of the way, the Court begins with Exemption 1, continues on to Exemption 3, and ends with the issue of official acknowledgement.

A. Exemption 1

Exemption 1 covers material "authorized . . . by an Executive Order to be kept secret in the interest of national defense or foreign policy."  5 U.S.C. § 552(b)(1)(A).  Here, the Government classified the 2005 OIG report under Executive Order 13,526.  See Def. MSJ at 8.  The Court's job, accordingly, is to consider whether the withheld record is "in fact properly classified pursuant to such Executive Order."  5 U.S.C. § 552(b)(1)(B).  Because the material withheld under this exemption could implicate national security, courts owe special deference to "executive affidavits predicting harm to the national security" and should not "undertake searching judicial review" of the Government's decision to classify information.  Larson, 565 F.3d at 865 (cleaned up).  Indeed, the court "must afford substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record, and little proof or explanation is required beyond a plausible assertion that information is properly classified." Shapiro v. U.S. Dep't of Just., 239 F. Supp. 3d 100, 121 (D.D.C. 2017) (cleaned up); see also ACLU v. U.S. Dep't of Defense, 628 F.3d 612, 624 (D.C. Cir. 2011) (Government justifications

of Exemption 1 withholdings "need only be both 'plausible' and 'logical' . . . in the national security context") (citation omitted).

Under E.O. 13,526, materials can be classified and withheld if "(1) an original classification authority is classifying the information; (2) the information is owned by . . . the United States Government; (3) the information falls within one or more of the categories of information" listed later in the EO; and (4) disclosure "reasonably could be expected to result in damage to the national security." Exec. Order 13,526 § 1(a)(1)–(4). The eight specified categories to which the material must "pertain[]" include, as relevant here, "intelligence activities (including covert action), [and] intelligence sources or methods." Id. § 1.4(c). As always, the CIA bears the burden of showing that it withheld "only such material as conforms to the [executive order's] substantive criteria for classification." King, 830 F.2d at 214.

Defendant's submission here clears this bar. Start with the first two prongs of the Executive Order. There is no dispute that the report in question has been properly classified by an "original classification authority." See Blaine Decl., ¶ 18. Nor is there any disagreement on the fact that the OIG report is "owned by and is under the control of the U.S. Government." Id.

As the Agency explains, moreover, the withheld portions of the OIG report comprise sensitive information that "would reveal specific intelligence sources, methods, and activities" and thus meet EO 13,526's third prong. Id., ¶ 20. More particularly — as the Court's *in camera* review confirmed — the redacted material includes the location of CIA facilities, the "existence of specific CIA intelligence activities abroad," intelligence methods that are still used by CIA, and details on the "foreign liaison partners that work with the CIA." Id., ¶¶ 22–25. Blaine's declaration further describes the kind of information found in the 2005 report category by category and provides a more than "plausible assertion that" this report falls within the category

7

of intelligence methods or sources. Morley, 508 F.3d at 1124. The Government has accordingly satisfied this prong, too.

Last, the CIA has shown that disclosure of the OIG report "reasonably could be expected to result in damage to the national security." Exec. Order 13,526 § 1.1(a)(4). As the Blaine declaration attests, for example, disclosure could reveal the location of clandestine Agency facilities. See Blaine Decl., ¶ 22. This in turn could "harm the CIA's continued ability to obtain accurate and timely foreign intelligence" and could even lead to terrorist backlash. Id.; see also Ullah v. CIA, 435 F. Supp. 3d 177, 184 (D.D.C. 2020) (accepting attestations that disclosure of CIA facility sites "would harm national-security interests"). Disclosure would also arm "hostile groups" with sensitive information, such as the Agency's involvement in covert operations, that could be used to "thwart CIA activities and attack the United States and its interests." Id., ¶ 23. And disclosure of the Government's intelligence methods would empower its targets to "take countermeasures." Id., ¶ 24. On this fourth and final prong, the CIA has established that "the predicted danger is a reasonable expectation." Halperin v. CIA, 629 F.2d 144, 149 (D.C. Cir. 1980).

Plaintiff does not take these conclusions head on, but instead objects that the information redacted from the OIG report cannot qualify as "intelligence sources or methods" because it constitutes evidence of CIA personnel's efforts to cover up al-Jamadi's death. See Pl. MSJ at 11. Since misconduct such as "destroying evidence" and "lying to" OIG is plainly beyond Defendant's remit, Hettena reasons, it cannot be classified under Executive Order 13,526 and cannot be protected by Exemption 1. Id.

As Hettena himself seems to recognize, this argument proves too much. He admits, for instance, that the CIA "need not disclose its investigation into the possible cover-up to the extent

doing so would reveal exempt information." Id. Yet that is precisely the kind of information that the 2005 OIG report contains — *viz.*, information revealing "intelligence activities (including covert action)" and "intelligence sources or methods." Exec. Order 13,526 § 1.4(c). And, based upon the Court's *in camera* review, information relating to the cover-up is inextricably intertwined with the rest of the report and cannot be released in any intelligible form. Cf. Property of the People, Inc. v. U.S. Dep't of Just., 2022 WL 1154680, at *2 (D.D.C. Apr. 19, 2022) (agency need not disclose portions of record "which taken separately or together have minimal or no information content") (citation omitted).

What is more, even if the Court agreed that the specific instances of agent misconduct fell beyond "the Agency's mandate to conduct foreign intelligence," CIA v. Sims, 471 U.S. 159, 169 (1985), it does not follow that an OIG report investigating this mischief cannot be properly classified under this Executive Order. Were this otherwise, as Hettena suggests, the CIA and other intelligence agencies would effectively be penalized for investigating misconduct. Plaintiff can cite to no case or FOIA provision that mandates such an unlikely result. Cf. Ctr. for Biological Diversity v. EPA, 722 F.3d 401, 411 (D.C. Cir. 2013) ("[A] statute should not be construed to produce an absurd result.") (citation omitted).

In any event, Hettena's contention that information or records stemming from illegal conduct can never be classified finds no support in the caselaw. "In fact, history teaches the opposite." ACLU, 628 F.3d at 622. Our Circuit and other courts in this district have time and again held that the fruits of illegal governmental activities "may nevertheless contain information of a sensitive nature, the disclosure of which could compromise legitimate secrecy needs." Lesar v. U.S. Dep't of Just., 636 F.2d 472, 483 (D.C. Cir. 1980); ACLU, 628 F.3d at 622 (holding that "[d]ocuments concerning surveillance activities later deemed illegal may still produce

9

information that may be properly withheld under exemption 1"); ACLU v. CIA, 892 F. Supp. 2d 234, 243 (D.D.C. 2012) (agreeing that "illegality of information is immaterial to the classification of such information"); see also ACLU v. U.S. Dep't of Just., 681 F.3d 61, 75 (2d Cir. 2012) (agreeing with D.C. Circuit and rejecting "argument that the Government could not withhold information relating to waterboarding on the grounds that waterboarding is now 'illegal' and therefore beyond the CIA's mandate").

Hettena never attempts to explain how portions of a report that merely "comment upon" alleged CIA misconduct merit less protection than the actual records produced by the allegedly unlawful cover-up, which the above makes clear can be withheld under Exemption 1. Lesar, 636 F.2d at 483. Indeed, Plaintiff ignores this body of law altogether. He nevertheless urges this Court to find that disclosure here "would not reveal any intelligence sources, methods, activities, and the like." Pl. MSJ at 12. The Court declines this invitation and instead finds that CIA has adequately justified the redactions it made pursuant to Exemption 1.

B. Exemption 3

Although the Court could stop here, for the sake of thoroughness it proceeds to also consider Exemption 3. This exemption protects from disclosure records "specifically exempted . . . by statute." 5 U.S.C. § 552(b)(3). The Court's sole task here is to decide whether the statute invoked qualifies under this exemption and whether the redacted material falls "within [that] statute's coverage." Morley, 508 F.3d at 1126. To meet that standard, the CIA relies upon two statutes: the National Security Act, which governs the protection from disclosure of "intelligence sources and methods," 50 U.S.C. § 3024(i)(1), and the Central Intelligence Agency Act, which prevents disclosure of "the organization or functions of the Agency, or of the names, official titles, salaries, or numbers of personnel employed by the Agency." 50 U.S.C. § 3507. "Both the

National Security Act and the CIA Act qualify as Exemption 3 statutes." DiBacco v. U.S. Dep't of the Army, 234 F. Supp. 3d 255, 275 (D.D.C. 2017).

The only remaining question is whether the withheld material comes within the ambit of either of these statutes. On this point, the Court begins and ends with the National Security Act. Because both the Executive Order analyzed above (EO 13,526) and this statute protect intelligence sources or methods, courts have unsurprisingly analyzed them "in the same manner" when both Exemptions 1 and 3 are invoked. ACLU, 892 F. Supp. 2d at 246; Larson, 565 F.3d at 863–66 (same); see also Assassination Archives & Rsch. Ctr. v. CIA, 657 F. Supp. 3d 95, 102 (D.D.C. 2023) (same). As our Circuit has explained, applicable precedent in fact "gives even greater deference to CIA assertions of harm to intelligence sources and methods under the National Security Act" than under EO 13,526. Wolf v. CIA, 473 F.3d 370, 377 (D.C. Cir. 2007) (citing Sims, 471 U.S. at 168–69). Having already found that the Blaine declaration adequately shows that the OIG report contains sensitive information comprising intelligence sources and methods, it follows *a fortiori* that this record is also protected from disclosure by the National Security Act and Exemption 3. See id. at 378 ("As discussed earlier, [the CIA's] detailing of harm satisfies the requirements of Exemption 1 and, coupled with the greater deference afforded the Agency under the National Security Act, we believe that the CIA also properly invoked Exemption 3 . . . ."); Int'l Counsel Bureau v. CIA, 774 F. Supp. 2d 262, 274 (D.D.C. 2011) (finding that Exemption 3 was properly invoked after court had, under Exemption 1 analysis, "found that the information requested . . . constitute[d] 'intelligence sources and methods'").

Resisting this outcome, Plaintiff re-ups his objection to the classification of information detailing "agents[] possibly covering up their misconduct," but there is no need to revisit this already-rejected contention. See Pl. MSJ at 11. Since he does not offer any other objections, the

11

Court therefore concludes that Defendant also properly invoked Exemption 3 to justify its redactions.

### C. Official Acknowledgement

Hettena makes his last stand on the hill of official acknowledgement. See Pl. MSJ at 7–9. This doctrine provides that "when an agency has officially acknowledged otherwise exempt information through prior disclosure, the agency has waived its right to claim an exemption with respect to that information." ACLU v. CIA, 710 F.3d 422, 426 (D.C. Cir. 2013). "To establish official acknowledgment, a plaintiff must identify information in the public domain that (1) matches the information requested, (2) is as specific, and (3) has been made public through an official and documented disclosure . . . . [by] the agency from which the information is being sought." Knight First Amend. Inst. v. CIA, 11 F.4th 810, 815–16 (D.C. Cir. 2021) (internal quotations omitted).

It is not enough for a plaintiff to show that similar information is in the public domain, however. He must go the extra step of establishing that "the specific information" he seeks is already in the public domain. Leopold v. CIA, 380 F. Supp. 3d 14, 23 (D.D.C. 2019) (emphasis added) (citation omitted). "The insistence on exactitude recognizes the Government's vital interest in information relating to national security and foreign affairs." Wolf, 473 F.3d at 378 (cleaned up). As another court of appeals noted, our Circuit's demand for identity between the disclosed information and the material requested will often mean that a FOIA plaintiff will "have little need for undisclosed information," since it presumably matches "precisely information previously disclosed." Osen LLC v. U.S. Cent. Command, 969 F.3d 102, 111 n.6 (2d Cir. 2020) (noting that this is "a feature, not a bug" of this Circuit's official-acknowledgement caselaw).

The Circuit's decision in Davis v. U.S. Dep't of Just., 968 F.2d 1276 (D.C. Cir. 1992), illustrates the stringency of this standard. There, the plaintiff sought tape recordings made

during an investigation of "reputed mafia boss Carlos Marcello," portions of which were introduced as evidence and played at Marcello's criminal trial. Id. at 1278. The Government admitted that the parts of these tapes that were played had been officially acknowledged, but it was willing to release "only exactly what [the plaintiff could] find in hard copy" — *e.g.*, newspaper stories quoting the exact portions of the tapes played at trial. Id. at 1280. The practical effect of this was that the sought records had "merely the added value of voice inflection." Id. As "grudging" as this position seems, the Circuit accepted that it followed from its official-acknowledgment precedents that "require the requester to point to 'specific' information identical to that being withheld." Id. (emphasis added).

Plaintiff points to two prior disclosures that meet this high bar — or so he says. The first is a report of al-Jamadi's death authored by the Criminal Investigation Division of the Army. See Pl. MSJ at 9. This report contains, *inter alia*, "statements made by [Department of Defense] witnesses to al-Jamadi's death," and it details the circumstances of the prisoner's apprehension, interrogation, and eventual demise. See Pl. SMJ, ¶ 16; see ECF No. 17-4 at 103–266 (Army CID Report). The second is an order signed by the then-Director of the CIA, admitting that Agency personnel were present during al-Jamadi's capture and "questioned Al-Jamadi at Abu Ghraib prison," and that the CIA's Inspector General was investigating allegations of misconduct surrounding his death. See ECF No. 17-4 at 102 (CIA Declassification Order). These sources, Hettena posits, prove that Defendant has officially acknowledged nearly all information "regarding al-Jamadi's interrogation and CIA agents' possible cover-up." Pl. MSJ at 7. The Court is not convinced.

Starting with the Army CID report, Plaintiff concedes that the CIA is bound only "by its own prior disclosures but not those of another agency." Id. at 9; see also Mobley v. CIA, 806

F.3d 568, 583 (D.C. Cir. 2015) ("Disclosure by one federal agency does not waive another agency's right to assert a FOIA exemption."). There is only one exception to this general rule — namely, that a "public disclosure made by an authorized representative of the agency's parent . . . is official as to the subordinate agency." Knight First Amend. Inst., 11 F.4th at 816 (cleaned up). Since the CIA has no parent agency, see id. at 817, this exception does not apply here.

Hettena nevertheless urges this Court to recognize a new exception for situations where an agency's involvement in creating the disclosed record "is apparent from the face of the previously released records and the surrounding circumstances." Pl. MSJ at 9. Because the CIA allegedly reviewed the Army CID report and consulted with the Department of Defense during that review period, Plaintiff insists that this public disclosure should be attributed to Defendant. See ECF No. 32 (Pl. Reply) at 3.

Plaintiff deserves some points for creativity, but his proposed exception cannot be squared with binding precedent. Take Afshar v. U.S. Dep't of State, 702 F.2d 1125 (D.C. Cir. 1983), for example. There, the plaintiff pointed to books written by former CIA officials to show that the Agency had publicly disclosed "CIA stations in, or intelligence liaisons with, foreign countries." Id. at 1133. Importantly for these purposes, the books were submitted to the CIA "for prepublication review" and were presumably published only after the agency gave its approval. Id. Regardless, the court there rejected the proposition that the CIA's "screening and approval of the books brought them into the official realm," concluding that these books could not be treated as the agency's own disclosures. Id. at 1133–34.

Consider also Moore v. CIA, 666 F.3d 1330 (D.C. Cir. 2011). In that case, the plaintiff requested CIA records concerning a suspected member of the Icelandic Communist Party and contended that the agency had publicly disclosed this information via an FBI report. Id. at 1331.

Despite the fact that the report indicated that the withheld information had originated from the CIA and not the FBI — and despite proof that the FBI and CIA had coordinated their response to the plaintiff's FOIA request — the Circuit concluded that the CIA was not bound by the FBI's disclosures. Id. at 1333 n.4; see also Knight First Amend. Inst., 11 F.4th at 817 (rejecting attribution of State Department disclosure to CIA even though both are members of "integrated" intelligence community that "relies heavily on collaboration among its members") (cleaned up). So much, then, for the first source of public acknowledgement.

The second disclosure Plaintiff submits — *i.e.*, the CIA Declassification Order — at the very least comes from the CIA itself. Yet it, too, falls short of the demanding standard for public acknowledgement. For starters, the Agency's disclosure here only divulges general information, such as the fact that its agents were present during the capture of al-Jamadi and subsequently interrogated him. See CIA Declassification Order. Having reviewed the disputed report *in camera*, the Court cannot help but conclude that there are "substantive differences" between this general public disclosure and the "comprehensive" information contained in the report. ACLU, 628 F.3d at 621; see also Protect Democracy Project, Inc. v. NSA, 10 F.4th 879, 891 (D.C. Cir. 2021) (no official acknowledgment where disclosed information "is not as specific as the information" in the sought record) (citation and quotation marks omitted).

Put another way, because the CIA acknowledgment he points to does not disclose any portions of the 2005 report he now seeks, he cannot show that the disclosed information "duplicate[s]" the material redacted from the OIG report. Pub. Citizen v. U.S. Dep't of State, 11 F.3d 198, 157 (D.C. Cir. 1993); Def. Reply at 3 (noting that CIA has never released the entire report or the specific information withheld here). As in Assassination Archives & Rsch. Ctr. v. CIA, 334 F.3d 55 (D.C. Cir. 2003), the best that Plaintiff can show is that "some information

disclosed" by the CIA is included in the OIG report. Id. at 60. Here, as there, the Court thus "cannot conclude" that Hettena "has shown that specific portions of the" report that were withheld "have been disclosed," so Defendant cannot be said to have officially acknowledged any of that information. Id. at 61; Cable News Network v. FBI, 293 F. Supp. 3d 59, 73 (D.D.C. 2018) (no official acknowledgement when former CIA Director made statements about requested record because "the Director's oral account of the [record] is no substitute for the written hard copy"); Kalu v. Internal Revenue Serv., 159 F. Supp. 3d 16, 24–25 (D.D.C. 2016) (same when FBI disclosed existence of watch list but not specifics of list or whether plaintiff was on it).

In sum, the first public disclosure — the Army CID report — does not win the day for Hettena because it was not made by "the agency from which the information is being sought." Frugone v. CIA, 169 F.3d 772, 774 (D.C. Cir. 1999). The second fares no better, as it is not "as specific" as the 2005 OIG report and thus does not "match" the information therein. Fitzgibbon v. CIA, 911 F.2d 755, 765 (D.C. Cir. 1990). The Court accordingly finds that the CIA has not officially acknowledged any portion of the report.

**IV.   Conclusion**

For the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment and deny Plaintiff's. A separate Order so stating will issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
Chief Judge

Date: March 22, 2024